**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| DJ Coleman, Inc. | ) | |
| | ) | **ORDER ON MOTIONS IN LIMINE** |
| Plaintiff, | ) | **(KENT MCKAY AND HENRY** |
| | ) | **BUCKWALTER)** |
| vs. | ) | |
| | ) | Case No. 1:08-cv-051 |
| Nufarm Americas, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

_____

Before the Court are several motions in limine filed by the Defendant on September 23, 2009, February 18, 2010, and February 19, 2010. See Docket Nos. 53, 78, and 83. The Defendant seeks to exclude the expert opinions of Kent McKay and Henry Buckwalter. For the reasons set forth below, the Court grants in part and denies in part the Defendant's motions.

This is a products liability action arising out of damage to the plaintiff's, DJ Coleman, Inc.'s, sunflower crop in 2007. DJ Coleman alleges that the crop damage was caused by the herbicide Assert® which is manufactured by the defendant, Nufarm Americas, Inc. The experts that are the subjects of the pending motions are a crop adviser and a principal consultant who assists chemical companies in registering agricultural products in the United States.

**I.    STANDARD OF REVIEW**

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. When deciding whether to admit expert testimony of a witness, the trial court acts as a "gatekeeper" to make "'a preliminary assessment of whether the reasoning or

methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" Glastetter v. Novartis Pharms. Corp., 252 F.3d 986, 988 (8th Cir. 2001) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-93 (1993)).

Daubert provides a framework for determining whether expert evidence is admissible at trial. At the outset, the court must, pursuant to Rules 104(a) and 702 of the Federal Rules of Evidence, determine whether the expert is proposing to testify to "(1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at 592. The court must ensure that the testimony or evidence is both reliable and relevant. Id. at 589. In Daubert, the Supreme Court provided a non-exhaustive list of factors to consider in assessing the testimony or evidence: (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory or technique has been generally accepted. Id. at 593-94. Since Daubert, some courts have considered additional factors, such as "'whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.'" Polski v. Quigley Corp., 538 F.3d 836, 839 (8th Cir. 2008) (quoting Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686-87 (8th Cir. 2001)).

The trial court has broad discretion in assessing the reliability of expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 142 (1999). However, the gatekeeper role should not invade the province of the jury whose job it is to decide issues of credibility and to weigh the evidence. United States v. Vesey, 338 F.3d 913, 917 (8th Cir. 2003). The purpose of the trial court's gatekeeping role is to separate expert opinion evidence based on "good grounds" from subjective

speculation masquerading as scientific knowledge.  Glastetter, 252 F.3d at 989 (citing Globetti v. Sandoz Pharms. Corp., 111 F. Supp. 2d 1174, 1177 (N.D. Ala. 2000)).

## II.     LEGAL DISCUSSION

### A.     KENT MCKAY

Nufarm has filed two motions in limine as to Kent McKay.  Nufarm's first motion seeks to "exclude the expert report and deposition testimony of Kent McKay and to exclude McKay from participating further in this case."  See Docket No. 54.  Nufarm's second motion in limine was filed after McKay had filed a supplemental expert report to expand the scope of his testimony.  In Nufarm's second motion in limine, it seeks to "exclude all of McKay's supplemental testimony and his report because his opinions exceed the scope of his proposed expert testimony, his analysis of damages, causation and Nufarm's duty to test fails under Daubert and Fed. R. of Evidence 702, and because McKay's opinions are not based on scientific knowledge, are not based on personal knowledge or testing, were not derived by the scientific method, and are not good science."  See Docket No. 78.

Nufarm contends that McKay (1) only looked at xeroxed copies of pictures of DJ Coleman's 2007 sunflower damage to make an assessment and form an opinion on the cause of the damage; (2) did not take into consideration the results of his own sunflower "strips" conducted in 2008; (3) did not take into account the pathology report of Kasia Kinzer, a plant pathologist who examined actual sunflower plant samples from DJ Coleman's fields; (4) did not test his hypothesis that Assert® caused damage to DJ Coleman's crop; (5) did not take into account Dr. Brian Jenks's testimony that to conduct his 2006 and 2007 studies he used an older bottle of Assert® which was manufactured by

3

BASF, not Nufarm; and (6) relies on Dr. Jenks's results from his 2006, 2007, and 2008 sunflower studies but does not know the rate of error for Dr. Jenks's results.

McKay received a bachelor of science degree from North Dakota State University (NDSU) in crop and weed science in 1988, and received a master's degree in that same specialized field in 1991. From 1991 to 2008, McKay worked as an agronomist for NDSU at the North Central Research Extension Center in Minot, North Dakota. McKay is currently the research director for Vision Research Park, LLC, a crop research and consulting company that contracts with chemical manufacturers to conduct research and test agricultural chemicals on crops grown in North Dakota. See Docket No. 42-1, pp. 13-14. Vision Research Park also does crop consulting for individual farmers. See Docket No. 42-1, pp. 14-15. McKay has over eighteen years of experience as a crop adviser. See Docket No. 42-1, p. 15. McKay has a pesticide license and a commercial applicator's license, and is re-tested every three years. See Docket No. 42-1, pp. 15-16, 20. As part of his job duties, McKay diagnoses plant injury on agricultural crops:

> Q. [Counsel for Nufarm]:  Have you ever been asked formally to diagnose plant injury before?
>
> A. [Kent McKay]:  Yes.
>
> Q. [Counsel for Nufarm]:  Okay. By whom?
>
> A. [Kent McKay]:  Oh, by farmers, by ag businessmen, countless times.
>
> Q. [Counsel for Nufarm]:  So people come in and say, I have – my plants are not doing well or something, do they ask you to come out and look at them?
>
> A. [Kent McKay]:  They can, yeah. Either we do a field visit or samples are brought to my attention. Whether that's the past at NDSU or the present. Yeah. That's an everyday occurrence.

| | |
|---|---|
| Q. [Counsel for Nufarm]: | Everyday occurrence? |
| A. [Kent McKay]: | Yeah. A lot of it is on the phone. A lot of it is explain to me over the phone what's going on. A lot of that can be just with a phone call. I mean, just the knowledge and the base of specifics of what's going on there, the crops, the knowledge base that you have, a lot of times those answers can be made over the phone. Pictures on the e-mail . . . . |

See Docket No. 42-1, pp. 56-57. McKay testified that the best method for investigating damage is by physically examining the damaged crops in the field, but most of his diagnoses result from pictures of the damaged crops being sent to him. See Docket No. 42-1, pp. 57-58.

McKay testified as to his step-by-step method of how he assesses crop damage and ultimately makes a determination as to the cause of the damage:

| | |
|---|---|
| Q. [Counsel for Nufarm]: | I just need help understanding a little more of the detail about when you generally diagnose plant injury or what's needed in a field when a farmer comes to you. What – do you have a technique? What do you use? I know after having spent 20 years doing this, a lot of this sort of comes naturally and you know a lot of it. But do you have a technique that you use, do you have a procedure, a set procedure, here's my algorithm, check this, one, two, three, four? |
| A. [Kent McKay]: | Sure. |
| Q. [Counsel for Nufarm]: | What is that? |
| A. [Kent McKay]: | Experience is number one. Number two is to thoroughly stage – thoroughly stage where the crop is at. You know, which stage. Is it still vegetative? Is it reproductive? You're thoroughly going through your mind. Now you're looking for any lesions on the plant, any holes an insect might cause. So, yeah, you're thoroughly looking through what type |

5

> of – is this – depending on the situation, is this a disease, is this an insect, or is this a chemical drift, which, you know, countless samples come in that, you know, farmers – back in the days, you know, it's not so much a problem anymore, but, yeah, you thoroughly start looking at the symptoms of the plant. Are the plants curled up, are they rolled, why is the stem twisted?

See Docket No. 42-1, pp. 64-65.

McKay has extensive experience in conducting herbicide trials and testing for injury:

> We do all sorts of aspects of herbicide trials. We work with a company that might have a new chemistry that they're looking at different rates of that herbicide to see what's safe. We basically will apply it at different stages to make sure that where – once the label comes, where they're going to be recommending that herbicide to be applied. So we're technically applying these different rates of this herbicide at different times, and then I visually have to go out and rate for injury, rate for weed control. They might be looking at a safener, another adjuvant, which one works the best. These are just some examples of some of the things that we do. So – so, yeah, very – gets to be very technical.

See Docket No. 42-1, pp. 38-39. McKay is familiar with Assert®, has used it, and recommends it to control wild mustard in sunflowers. See Docket No. 42-1, pp. 96-98. McKay also has extensive experience in researching the effects of various agricultural chemicals on sunflowers, and works closely with scientists and state specialists. See Docket No. 42-1, pp. 79-81.

In McKay's expert report, he states, in part:

> The damage to Mr. Coleman's crop consists of head deformation symptoms. Head deformation results in a crop that cannot be harvested and which produces no yield. The head deformation symptoms from Mr. Coleman's fields are similar to Dr. Brian Jenks pictures of injury symptoms that he indicated with his research that same year (2007). The 2007 "sunflower tolerance to Assert" study conducted by Dr. Jenks indicated significant sunflower injury and yield loss following all Assert label guidelines plus the recommended use of a non-ionic surfactant.
>
> In 2007, Dr. Jenks' research studies were conducted in Minot and Mr. Coleman's fields were located near Washburn. The climates, soils, and other relevant planting factors are similar in the Minot and Washburn areas. Mr. Coleman and Mr. Jenks had

> similar planting dates and Assert spray dates. Both followed label guidelines as far as meeting the safe crop stage for application and were sprayed in the 4-to-6 leaf stage. Both Mr. Coleman and Mr. Jenks also met label guidelines with respect to temperature requirements. In both cases, severe injury occurred with the Assert, with losses of 50% of normal yield reported. Based on my education and experience, it is my opinion the Assert caused the significant damage to Mr. Coleman's sunflowers in 2007.
>
> There were some differences between Dr. Jenks controlled study and Mr. Coleman's methods in 2007. In Mr. Coleman's case he mixed Scoil and Asana with the Assert. Scoil is a methylated seed oil (MSO). MSO is an adjuvant most often used with Assert in small grains for greater and more consistent weed control. An MSO is commonly used with Assert in conjunction with sunflowers to enhance the wild mustard control. Mr. Coleman also mixed Asana, an insecticide, to control sunflower beetles. Based upon my education and experience, it is my opinion the mixture of Scoil, Asana, and Assert would not cause any losses in weed control or potential injury to the sunflower crop when sprayed at the safe crop stage.

See Docket No. 36-4. In his supplemental expert report, McKay also expresses opinions as to Nufarm's duties to test Assert® and to properly process and report customer complaints under Section 6(a)(2) of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA). See Docket No. 74-7. FIFRA § 6(a)(2), 7 U.S.C. § 136d(a)(2), provides: "If at any time after the registration of a pesticide the registrant has additional factual information regarding unreasonable adverse effects on the environment of the pesticide, the registrant shall submit such information to the Administrator." DJ Coleman contends that pursuant to FIFRA § 6(a)(2), Nufarm had an obligation to report the customer complaints on Assert® to the Environmental Protection Agency (EPA).

Daubert's gatekeeping obligation does not only apply to testimony based on "scientific" knowledge but also applies to testimony based on "technical" and "other specialized" knowledge. Kumho, 526 U.S. at 141. Thus, even where the expert proffers an opinion based on experience, rather than on purely scientific knowledge, a trial court may consider Daubert's factors when doing so will help determine that testimony's reliability. Id. at 151. The United States Supreme Court made clear in Kumho that the test for reliability is "flexible." Id. at 141.

7

In reviewing the totality of the evidence presented, the Court finds that McKay's causation opinions in the original and supplemental reports are based on sufficient facts and data, and are the product of reliable principles and methods. McKay's causation opinions are based on his review of numerous depositions and documents in this case and further review of weather data from 2006 and 2007. See Docket No. 42-1, pp. 24-29, 105-06. McKay testified that he met with Clark Coleman and discussed the weather for the 2007 growing season, and reviewed Clark's crop records and notes from 2007 which indicated his planting dates, receipts for the chemicals purchased, and "dozens of pictures" of the crop damage. See Docket No. 42-1, pp. 23, 67. McKay also reviewed "a lot" of pictures from Dr. Jenks's 2006 and 2007 studies prior to forming his opinions in this case. See Docket No. 42-1, p. 177. The Court finds that McKay's methodology satisfies the Daubert/Kumho standard of reliability. McKay has received multiple awards relating to his crop research and has written numerous publications relating to farm chemical effects and regarding crop damage and disease. McKay has an extensive background in analyzing and diagnosing crop damage, coupled with his background in crop research, provides an adequate basis upon which McKay can offer opinions about causation. Accordingly, the Court finds that McKay's opinions as to the cause of damage to DJ Coleman's 2007 sunflower crop are admissible under Rule 702.

The Court further finds that McKay's opinions as to Nufarm's duties to test Assert® are admissible under Rule 702. Such testimony is relevant and reliable and satisfies the minimum standards under Daubert and Kumho. However, the Court finds that McKay's opinions relating to the processing and reporting of Assert® complaints under FIFRA § 6(a)(2) do not satisfy the minimum standards of reliability under Daubert and Kumho. DJ Coleman has failed to provide any background information on McKay to show that he has scientific, technical, or specialized knowledge to present testimony on this limited subject matter. Accordingly, the Court finds that McKay's

opinions as to Nufarm's duty to test its products are admissible but his opinions on the proper handling and reporting of customer complaints are inadmissible.

### B.     HENRY BUCKWALTER

Nufarm also seeks to exclude the original and supplemental expert reports and deposition testimony of Henry Buckwalter and to exclude Buckwalter from participating further in this case. Nufarm contends that Buckwalter, in rendering his opinions, has failed to consider Clark Coleman's testimony that he did not read the Assert® label in 2007 prior to applying the herbicide to the sunflower crop.

Henry Buckwalter is a principal consultant who assists chemical companies in registering agricultural products in the United States. Buckwalter has an extensive background in drafting and interpreting agricultural product labels. He also works directly with the EPA to expand labels that have already been registered. See Docket No. 42-2, pp. 32-33.

Buckwalter obtained a bachelor's degree in agronomy in 1974 and a master's degree in agronomy in 1981. From 1979 to 1982, Buckwalter was employed by BASF to conduct field research on farm products. From 1982 to 1986, Buckwalter was a technical service representative for ICI Americas, Inc., and was the contact person between the research and development department, universities, and extension personnel, and regulatory agencies.[1] From 1986 to 1989, Buckwalter worked for United Agri Products (UAP) as a manager for product registration and environmental affairs, where he was responsible for registering agricultural chemicals. From 1989

---

[1] Buckwalter first started to work on product labels in 1982 while working at ICI Americas. See Docket No. 42-2, pp. 37-78.

to 2005, Buckwalter worked as the senior registration scientist at Crompton Uniroyal Chemical Company, where he was responsible for federal licensing of new products and new users for licensed products.

Buckwalter is designated as an expert in this case as to 40 C.F.R. Part 158 of FIFRA and standard agricultural practices.

Buckwalter provides the following opinions in his expert report:

> The Assert® Herbicide label, EPA Reg. No. 71368-62, version 071368-00062.20060316.sunflower . . . is conflicting and misleading.
>
> . . .
>
> Additionally, Mr. [Al] Oberembt erroneously concluded in his statement that the tank mix reported by Mr. Coleman was not allowed. This conclusion is incorrect because the aforementioned Assert® label under the Sunflower, General Information, section reads, "Nufarm does not recommend tank mixing this product with herbicides or insecticides when used on sunflowers."
>
> . . .
>
> Extensive training of field personnel by agricultural chemical manufacturers in the handling of complaints is an industry standard. Nufarm's investigation of this and previous Assert® product phytotoxicity complaints are not industry standard.

See Docket No. 36-1.

Buckwalter expands the scope of his expert opinion in the supplemental expert report, to include the following:

> [I]t is my opinion that an agricultural chemical company such as Nufarm has a duty to test its products commensurate with the dangers involved in the intended use of the product. Further, a duty to test agricultural chemicals also arises when a chemical company is made aware through complaints or otherwise of a potential defect in the product. In this case, it is my expert opinion that Nufarm had a duty to conduct further testing with regard to Assert commensurate with the risk of Assert related damage to sunflowers, and Nufarm breached its duty. Researcher Dr. Brian Jenks specifically informed Nufarm that Assert had caused damage to sunflowers in North Dakota, even when applied in accordance with the label.

10

. . .

The depositions of Mr. Mahlburg and Mr. Feist demonstrate the lack of a clear and comprehensive procedure for handling product complaints and filing of FIFRA 6.a 2s by Nufarm management.  Because there was a lack of procedure, the initial complaint investigation was flawed and inconsistent with industry standards.  In my opinion, Nufarm breached its duty to properly handle product complaints relating to Assert.

See Docket No. 74-8.

Buckwalter contends that he is an expert on 40 C.F.R. Part 158 which pertains to data requirements for pesticides.  Buckwalter bases his expert opinions on experience and on specific training in FIFRA:

> Q. [Counsel for Nufarm]: So in writing this letter about this case it seems you're relying on experience and not training, not – you didn't[] – your degrees and your education are not related to what are – the letter you wrote, it's just your experience having worked in the field?
>
> A. [Henry Buckwalter]: Well, there's not an institution in the United States that gives you a degree in FIFRA, so you can't get a degree in FIFRA.
>
> You gain experience with FIFRA, and successes and nonsuccesses, and when you're successful you would be considered – how would you say, compliant with FIFRA.
>
> So I don't – I wouldn't say – granted, my background and training and what I've explained when I wrote the letter to Scott was based on my experience, because you don't have a degree in FIFRA.
>
> And –
>
> Q. [Counsel for Nufarm]: That's what – I mean, there's no way to say I'm going to go get an education in FIFRA, or pesticides, or labeling.

11

|  |  |
|---|---|
|  | You can't go set out and get an education? |
| A. [Henry Buckwalter]: | No, not really, because I think I've listed several of the extension courses I've taken. These are all related to FIFRA. The Mid-America Toxicology Course was strictly aimed at FIFRA and toxicology. |
|  | FIFRA Boot Camp done by Kim Regg in D.C. was strictly FIFRA. |
|  | My background in toxicology, strictly related to pesticide toxicology, and that was all related to FIFRA. |

See Docket No. 42-2, pp. 66-67. Buckwalter testified that state agencies and the EPA provide information on how to assemble a label, how to read a label, and what goes into a label. See Docket No. 42-2, pp. 77-79. Buckwalter has observed product labels other than Assert® which were ambiguous and assisted in changing the language of the labels to ensure clarity. See Docket No. 42-2, pp. 84-85.

The Court finds that Buckwalter's opinions as to the ambiguity of the Assert® label are based on sufficient facts and data, and are the product of reliable principles and methods. Buckwalter has an extensive background in drafting and registering agricultural chemical labels, coupled with his specific training on FIFRA, provides an adequate basis upon which Buckwalter can offer his opinions as to the ambiguity of the Assert® label. The Court further finds that Buckwalter is qualified to proffer opinions about Nufarm's duty to test Assert®. The Court finds that Buckwalter has the necessary scientific, technical, or specialized knowledge to testify as to a chemical company's duty to test its products and, therefore, Buckwalter's opinions as to Nufarm's duty to test Assert® are reliable under Daubert and Kumho and admissible at trial.

The Court also finds that Buckwalter is qualified to testify about industry practice of a chemical company in processing and reporting customer complaints under FIFRA § 6(a)(2). Buckwalter has knowledge in the area of product registration and has the necessary scientific, technical, or specialized knowledge to opine on industry practice in the chemical industry.

### III.  CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** the Defendant's "Daubert Motion to Exclude Testimony of Kent McKay" (Docket No. 53) and "Renewed Motion to Exclude Testimony of Kent McKay" (Docket No. 78). The Court finds that Kent McKay's opinions as to the cause of the damage to DJ Coleman's 2007 sunflower crop are admissible under Rule 702. Further, Kent McKay's opinions as to Nufarm's duties to test Assert® are admissible but any opinions concerning how to properly handle customer complaints are unreliable and inadmissible under Rule 702.

The Court **DENIES** the Defendant's "Daubert Motion to Exclude Testimony of Henry Buckwalter" (Docket No. 83). The Court finds that Henry Buckwalter's expert opinions as to the ambiguity of Assert's label are admissible under Rule 702. Further, Henry Buckwalter's opinions as to Nufarm's duty to test Assert® and industry practice of a chemical company in handling customer complaints are reliable and admissible under Rule 702.

The challenges to the expert opinions of McKay and Buckwalter go largely to the weight and not the admissibility of the testimony. Many of Nufarm's concerns can be addressed by way of cross-examination. As the Supreme Court emphasized in <u>Daubert</u>, 509 U.S. at 596, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof

are the traditional and appropriate means of attacking shaky but admissible evidence." Nufarm will have a full opportunity to cross-examine each of the Plaintiff's experts and highlight the shortcomings of their testimony. The Court's gatekeeper role should not invade the province of the jury whose job it is to decide issues of credibility and to determine the weight to be accorded such evidence. The trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system.

**IT IS SO ORDERED.**

Dated this 12th day of March, 2010.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court