**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| DJ Coleman, Inc., | ) | |
| | ) | **ORDER ON DEFENDANT'S MOTIONS** |
| Plaintiff, | ) | **FOR SUMMARY JUDGMENT** |
| | ) | |
| vs. | ) | |
| | ) | |
| Nufarm Americas, Inc. | ) | |
| | ) | Case No. 1:08-cv-051 |
| Defendant. | ) | |

Before the Court are the Defendant's "Motion for Summary Judgment" and "Renewed Motion for Summary Judgment and Reply to Plaintiff's Reply to Defendant's Summary Judgment Motion" filed on July 1, 2009 and August 26, 2009. See Docket Nos. 28 and 40. The Plaintiff filed responses in opposition to the motions on July 31, 2009 and January 20, 2010. See Docket Nos. 38 and 75. The Defendant filed a reply brief on August 26, 2009. See Docket No. 44. For the reasons set forth below, the Defendant's motion for summary judgment and renewed motion for summary judgment are granted in part and denied in part.

I.      **BACKGROUND**

The plaintiff, DJ Coleman, Inc. ("DJ Coleman"), is a farm corporation that is incorporated in the State of North Dakota and conducts farming operations in Burleigh County, North Dakota. DJ Coleman's principal, Clark Coleman, is responsible for DJ Coleman's commercial farming operations. Clark Coleman is a licensed pesticide purchaser and applicator. The defendant, Nufarm Americas, Inc. ("Nufarm"), is an Illinois corporation. Between May 10, 2007 and May 24, 2007,

1

Clark Coleman planted different varietals of sunflowers.  Clark Coleman used pre-emergent chemicals, Mad Dog®, a generic glyphosate broad-spectrum herbicide, and Spartan®, a herbicide, prior to planting the sunflowers.  Between June 21, 2007 and June 24, 2007, Clark Coleman sprayed his post-emergent sunflower crops with a tank mix of Assert®,[1] Scoil®,[2] and Asana®.[3]  Nufarm is the manufacturer of Assert® and the wholesale distributor to United Agri Products, Inc. ("UAP"), the direct North Dakota retail seller to Clark Coleman.  Clark Coleman did not contact Nufarm for approval before tank mixing Assert®, Scoil®, and Asana® in 2007.  DJ Coleman alleges that Assert® caused severe damage to its 2007 sunflower crop by producing stunted and deformed heads, and seeks economic and non-economic damages.

This action was originally filed in Burleigh County District Court in April 2008.  Nufarm removed the action to federal district court on May 7, 2008.  See Docket No. 1.  DJ Coleman alleges claims of products liability, negligence, failure to warn, breach of warranties, and violations of N.D.C.C. chs. 51-12[4] and 51-15 for false and deceptive advertising.  Nufarm now moves for summary judgment on each claim.

---

[1]  Assert® is a post-emergent herbicide that is labeled to control wild mustard in sunflowers planted in Minnesota, North Dakota, and South Dakota.  See Docket No. 30-6.

[2]  Scoil® is a methylated seed oil (MSO) that was developed jointly by North Dakota State University and AGSCO as a super-active adjuvant.  An adjuvant is a chemical that is mixed with a herbicide to assist the herbicide in getting through the waxy layer of the plant leaves.

[3]  Asana® is a "restricted use pesticide" manufactured by DuPont, meaning that the pesticide can only be purchased by licensed pesticide applicators such as Clark Coleman.

[4]  The Plaintiff's complaint improperly alleges false advertising claims under N.D.C.C. ch. 35-12.  The Court will treat the Plaintiff's claims for false advertising under the proper chapter of the North Dakota Century Code, N.D.C.C. ch. 51-12.

## II.    __STANDARD OF REVIEW__

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(c).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the burden of demonstrating an absence of a genuine issue of material fact.  Simpson v. Des Moines Water Works, 425 F.3d 538, 541 (8th Cir. 2005).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

This action is based on diversity jurisdiction.  Therefore, the Court will apply the substantive law of North Dakota.  See Paracelsus Healthcare Corp. v. Philips Med. Sys., 384 F.3d 492, 495 (8th Cir. 2004).

3

III.    **LEGAL DISCUSSION**

DJ Coleman raises claims of products liability, negligence, failure to warn, breach of warranties, and violations of N.D.C.C. chs. 51-12 and 51-15. Nufarm contends that it is entitled to summary judgment on each of the claims.

## A.   NEGLIGENCE AND STRICT LIABILITY CLAIMS

DJ Coleman alleges claims of products liability, negligence, and failure to warn which are tort claims grounded in negligence or strict liability. "Products liability grew out of a public policy judgment that people need more protection from dangerous products than is afforded by the law of warranty." East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 866 (1986). Under principles of products liability, a manufacturer of a defective product may be liable for personal injury and property damage. "Under the [economic loss] doctrine, economic loss resulting from damage to a defective product, as distinguished from damage to other property or persons, may be recovered in a cause of action for breach of warranty or contract, but not in a tort action." Steiner v. Ford Motor Co., 606 N.W.2d 881, 884 (N.D. 2000). The economic loss doctrine is not a fixed rule and there are numerous exceptions across the jurisdictions. "The economic loss doctrine is based on the understanding that contract law, and the law of warranty in particular, is better suited for dealing with purely economic loss in the commercial arena than tort law, because it permits the parties to specify the terms of their bargain and to thereby protect themselves from commercial risk." Dakota Gasification Co. v. Pascoe Bldg. Sys., 91 F.3d 1094, 1098 (8th Cir. 1996).

In East River, the plaintiffs sued the manufacturer of four ships whose turbines failed as a result of a product defect and caused damage solely to the turbines. The plaintiffs alleged tortious conduct and sought damages for the costs of repairing the ships and for lost income while the ships

were out of service.  At issue was whether the plaintiffs could recover in tort for the damage to the "product itself," i.e., the turbines.  The United States Supreme Court considered the three main approaches that courts were following at that time:  (1) the "majority approach" which denied tort recovery when the defective product caused damage to itself, and did not cause damage to other property or personal injury; (2) the "minority approach" which allowed tort recovery when the defective product damaged only itself; and (3) the "intermediate approach" which allowed tort recovery when the defective product damaged only itself under certain circumstances.  The United States Supreme Court adopted the majority approach, and determined that the plaintiffs were not entitled to recover in tort for the defective turbines damaging only themselves.  The Supreme Court said:

> The tort concern with safety is reduced when an injury is only to the product itself.  When a person is injured, the "cost of an injury and the loss of time or health may be an overwhelming misfortune," and one the person is not prepared to meet.  In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or, as in this case, experiences increased costs in performing a service.  Losses like these can be insured.  Society need not presume that a customer needs special protection.  The increased cost to the public that would result from holding a manufacturer liable in tort for injury to the product itself is not justified.

> Damage to a product itself is most naturally understood as a warranty claim.  Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received "insufficient product value."  The maintenance of product value and quality is precisely the purpose of express and implied warranties. Therefore, a claim of a nonworking product can be brought as a breach-of-warranty action.  Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract.

East River, 476 U.S. at 871-72 (internal citations omitted).  The Supreme Court determined that recovery by the plaintiffs on a warranty theory would entitle them to the costs of the repair and lost

profits, and would place them in the position that they would have been in had the turbines worked properly.

In East River, the United States Supreme Court did not consider whether a plaintiff could recover in tort when the defective product injures "other property" or persons.  The Supreme Court considered this issue in Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875 (1997).  In Saratoga Fishing, the owner of a fishing vessel brought an admiralty tort action against the manufacturer of the vessel and the designer of the vessel's hydraulic system, alleging that the hydraulic system was defectively designed.  The case arose from an engine room fire and flood that led to the sinking of the fishing vessel.  The Supreme Court described the owner of the vessel at the time of the fire as the "Subsequent User," as compared to the "Initial User," who had purchased the vessel from the manufacturer.  The Initial User added certain equipment (skiff, net, and various spare parts) to the vessel upon purchase from the manufacturer.  The issue was whether the added equipment was "other property" under the economic loss doctrine and, therefore, recoverable under tort law.  The United States Supreme Court held that the added equipment constituted "other property":

> We conclude that equipment added to a product after the Manufacturer (or distributor selling in the initial distribution chain) has sold the product to an Initial User is not part of the product that itself caused physical harm.  Rather, in East River's language, it is "other property."  (We are speaking, of course, of added equipment that itself played no causal role in the accident that caused the physical harm.)  Thus the extra skiff, nets, spare parts, and miscellaneous equipment at issue here, added to the ship by a user after an initial sale to that Initial User, are not part of the product (the original ship with the defective hydraulic system) that itself caused the harm.

Saratoga Fishing, 520 U.S. at 884-85.

The economic loss doctrine was first applied by the North Dakota Supreme Court in Hagert v. Hatton Commodities, Inc., 350 N.W.2d 591 (N.D. 1984) ("Hagert I").  Hagert I involved a commercial transaction, but the North Dakota Supreme Court later followed the majority of courts in applying the economic loss doctrine to consumer transactions as well.  See Steiner v. Ford Motor Co., 606 N.W.2d 881 (N.D. 2000); Clarys v. Ford Motor Co., 592 N.W.2d 573 (N.D. 1999).  The North Dakota Supreme Court has not considered whether tort recovery is permitted for damage to "other property."

In Coop. Power Ass'n v. Westinghouse Elec. Corp., 493 N.W.2d 661 (N.D. 1992), the North Dakota Supreme Court revisited the issue of the economic loss doctrine, and adopted the rationale of East River.  Cooperative Power Association purchased a transformer for use at a coal plant.  An electrical arc in the transformer caused damage to the transformer itself.  Cooperative Power Association sued Westinghouse in federal district court alleging breach of express warranty, breach of contract, negligence, and negligent misrepresentation.  The federal court certified to the North Dakota Supreme Court the issue of "May a manufacturer of a machine sold in a commercial transaction be held liable in negligence or strict product liability theory for economic loss caused by the failure of a component part of the machine, which causes direct damage to the machine only?"  Coop. Power, 493 N.W.2d at 662.  The North Dakota Supreme Court answered in the negative, holding that the manufacturer of a machine cannot be held liable in negligence or strict liability for economic loss caused by the failure of a component part of the machine which causes damage to only the machine itself.  The North Dakota Supreme Court stated:

> A contractual duty arises from society's interest in the performance of promises and has been traditionally concerned with the fulfillment of reasonable economic expectations.  Society's need to spread losses is substantially lessened in commercial transactions where damage is to only the product itself, because those

losses essentially relate to the benefit of the bargain between business entities. That loss is most frequently measured by the cost of repairs, the difference in the value of the product, or consequential damages attributable to the failure of the product to perform as expected. Those losses are based upon, and flow from, the purchaser's loss of the benefit of the contractual bargain and are the type for which a warranty action provides redress.

Id. at 664 (internal citation omitted).  While Coop. Power did not involve damage to "other property," the North Dakota Supreme Court stated in dicta:

CPA nevertheless argues that a "risk of harm" analysis is applicable to commercial transactions because that analysis provides manufacturers with incentive to produce safe products.  CPA asserts that it is only through fortuitous circumstances that this defective product did not damage other property or people in the area.  Although society has a strong interest in safe products, the rules of negligence and strict liability for damage to property other than the product itself and for personal injury adequately protect that interest and provide manufacturers with incentive to produce safe products.

Id. at 665.

In Dakota Gasification Co. v. Pascoe Bldg. Sys., 91 F.3d 1094 (8th Cir. 1996), the Eighth Circuit Court of Appeals adopted an expansive approach to the economic loss doctrine.  Dakota Gasification purchased an oxygen plant from the government at a significantly reduced rate under the condition that Dakota Gasification would forego a percentage of the profits.  The purchase contract stated that the plant was purchased "'AS IS, WHERE IS,' WITHOUT WARRANTY, EXPRESS OR IMPLIED, INCLUDING WITHOUT WARRANTY AGAINST INFRINGEMENT, WARRANTY OF MERCHANTABILITY AND WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE."  Dakota Gasification, 91 F.3d at 1097.  Several years after purchasing the oxygen plant, the roof collapsed under the weight of ice and snow, causing damage to various items in the plant.  Dakota Gasification sued the seller of the steel roof alleging tort claims.  At issue was whether the economic loss doctrine barred tort actions where the damage was to other nearby

9

property of commercial purchasers who could foresee such risks at the time of purchase. The federal district court predicted that the North Dakota Supreme Court would adopt the expansive, modern trend which precluded liability in tort for physical damage to the same property or other property where the damage was a foreseeable result of a defect at the time the parties contracted. The Eighth Circuit agreed:

> The trial court recognized that the modern trend in many jurisdictions holds that tort remedies are unavailable for property damage experienced by the owner where the damage was a foreseeable result of a defect at the time the parties contractually determined their respective exposure to risk, regardless [of] whether the damage was to the "goods" themselves or to "other property." Although there is no North Dakota case directly on point, the reasoning used by the courts that have accepted this modern trend, along with the North Dakota Supreme Court's reasoning in <u>Cooperative Power</u>, lead us to conclude that the modern trend's approach is entirely consistent with North Dakota's prior treatment of the economic loss doctrine.

<u>Id.</u> at 1099.

Subsequent to the Eighth Circuit's ruling in <u>Dakota Gasification</u>, the United States Supreme Court issued the decision of <u>Saratoga Fishing</u>, previously discussed, which rejected an expansive approach to the economic loss doctrine, and the American Law Institute adopted the Restatement (Third) of Torts: Products Liability § 21. The Restatement (Third) of Torts: Products Liability § 21 also rejected an expansive approach and adopted <u>East River</u>'s and <u>Saratoga Fishing</u>'s "property/other property" dichotomy, providing:

> For purposes of this Restatement, harm to persons or property includes economic loss if caused by harm to:
>
> (a)   the plaintiff's person; or
>
> (b)   the person of another when harm to the other interferes with an interest of the plaintiff protected by tort law; or
>
> (c)   the plaintiff's property other than the defective product itself.

10

Restatement (Third) of Torts: Products Liability § 21.

In <u>Albers v. Deere & Co.</u>, 599 F. Supp. 2d 1142 (D.N.D. 2008), this Court recently determined that the economic loss doctrine barred tort recovery for "other property" where the damage was reasonably foreseeable.  In <u>Albers</u>, the plaintiff purchased a used combine and header in a single purchase.  The purchase order identified the combine and header as separate products. The combine ignited and burned both the combine and the header.  The plaintiff brought an action in federal district court seeking damages for the loss of the combine, header, and fuel.  The plaintiff alleged negligent design or manufacturing, negligent failure to warn, contract/breach of warranties, and strict liability failure to warn.  In considering whether the economic loss doctrine precluded tort relief for the damages sought, the Court noted that the prediction of the North Dakota Supreme Court's determination was difficult in light of both <u>Saratoga Fishing</u> and the Restatement (Third) of Torts: Products Liability § 21 rejecting expansive approaches to the economic loss doctrine. However, because the issue was not a matter of first impression, the Court was obligated to follow the Eighth Circuit's prediction of North Dakota law unless a subsequent state court decision or statutory amendment had rendered the prediction clearly wrong.  Finding no such state court decision or statutory amendment, the Court followed the Eighth Circuit's ruling in <u>Dakota Gasification</u>:

> In this case, while there may be a substantial question with respect to the continued viability of <u>Dakota Gasification</u>'s prediction, it cannot be said it is clearly wrong.  The North Dakota Supreme Court has not squarely addressed the issue and its most recent statements in <u>Clarys</u>, that tort recovery is permitted for damage to property other than the product itself, are *dicta*.  Further, <u>Dakota Gasification</u>'s "foreseeability approach" does not foreclose tort recovery for damage to all "other property" – only damage that could have been foreseen and made the subject of the purchase negotiations.  As such, it is only an incremental step beyond what the North Dakota Supreme Court has suggested in broad terms is the law, and it is a step that several courts have taken as indicated by the prior discussions, including most

recently the Wisconsin courts.  Thus, it is possible that the North Dakota Supreme
Court might follow Dakota Gasification, or a similar variant of the "foreseeability
approach," when directly presented with the question.

Albers, 599 F. Supp. 2d at 1152.  The Court applied the foreseeability approach of Dakota

Gasification and concluded that the damage to the header and the loss of gasoline were foreseeable.

DJ Coleman acknowledges the existing precedent in this circuit which bars any recovery

in tort.  However, DJ Coleman requests that the Court certify to the North Dakota Supreme Court

the question of whether the economic loss doctrine applies when there is damage to property other

than the product itself.  The Court declines to do so.  The Court will uphold the precedent of the

Eighth Circuit as established in Dakota Gasification.  Applying Dakota Gasification's "foreseeability

approach," the Court finds that damage to the sunflower crop was clearly foreseeable in the event

of a defect in the herbicide Assert®.  Other courts have found that the economic loss doctrine bars

claims for negligence and strict liability in cases where herbicides damaged farm crops.

See Maynard Coop. Co. v. Zeneca, Inc., 143 F.3d 1099 (8th Cir. 1998); Bailey Farms, Inc. v. NOR-

AM Chem. Co., 27 F.3d 188 (6th Cir. 1994).  The Court finds that DJ Coleman's products liability,

negligence, and failure to warn claims are barred by the economic loss doctrine.  Accordingly,

summary judgment is granted on these claims.


**B.       EXPRESS AND IMPLIED WARRANTY CLAIMS**

DJ Coleman contends that Nufarm breached an express warranty of fitness for a particular

purpose and implied warranties of fitness and merchantability.  DJ Coleman also contends that it

was a third-party beneficiary to any express or implied warranties that Nufarm gave to distributors,

retailers, resellers, and others, and that Nufarm breached express and implied warranties to distributors, retailers, resellers, and others.

Despite finding that the economic loss doctrine bars recovery under DJ Coleman's tort claims, damages may be recoverable under express and implied warranties.  See Hagert I, 350 N.W.2d at 595.  A plaintiff may recover added expenses and lesser yield on claims based on warranty theories.  Id.

The Assert® label provides, in part:

Directions for Use of this product should be followed carefully.  It is impossible to eliminate all risks inherently associated with the use of this product.  Desirable plant injury, ineffectiveness, or other unintended consequences may result because of such factors as manner of use or application, weather or crop conditions beyond the control of Nufarm or Seller.  All such risks shall be assumed by Buyer and User, and Buyer and User agree to hold Nufarm and Seller harmless for any claims relating to such factors.

**Seller warrants that this product conforms to the chemical description on the label and is reasonably fit for the purposes stated on the Directions for Use when used in accordance with the directions under normal conditions of use. NUFARM MAKES NO WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE, NOR ANY OTHER EXPRESS OR IMPLIED WARRANTIES WITH RESPECT TO THE SELECTION, PURCHASE OR USE OF THIS PRODUCT.  Any warranties, express or implied, having been made are inapplicable if this product has been used contrary to label instructions, or under abnormal conditions, or under conditions not reasonably foreseeable to (or beyond the control of) seller or Nufarm, and Buyer assumes the risk of any such use.**

To the extent allowed by law, Nufarm or Seller shall not be liable for any incidental, consequential, or special damages resulting from the use or handling of this product. To the extent allowed by law, THE EXCLUSIVE REMEDY OF THE USER OR BUYER, AND THE EXCLUSIVE LIABILITY OF NUFARM AND SELLER FOR ANY AND ALL CLAIMS, LOSSES, INJURIES OR DAMAGES (INCLUDING CLAIMS BASED ON BREACH OF WARRANTY, CONTRACT, NEGLIGENCE, TORT, STRICT LIABILITY OR OTHERWISE) RESULTING FROM THE USE OR HANDLING OF THIS PRODUCT, SHALL BE THE RETURN OF THE PURCHASE PRICE OF THE PRODUCT OR AT THE ELECTION OF NUFARM OR SELLER, THE REPLACEMENT OF PRODUCT.

. . .

### USES WITH OTHER PRODUCTS (TANK MIXES)

**If this product is used in combination** with any other product except as specifically recommended in writing by Nufarm, then Nufarm shall have no liability for any loss, damage, or injury arising out of its use in any such combination not so specifically recommended.  If used in a combination recommended by Nufarm, the liability of Nufarm shall in no manner extend to any damage, loss or injury not directly caused by the inclusion of the Nufarm product in such combination use, and in any event shall be limited to return of the amount of the purchase price of the product.

See Docket No. 30-6 (emphasis in original).


### 1)        APPLICATION OF WARRANTY DISCLAIMERS

DJ Coleman alleges that "Defendant expressly warranted that, among other things, the Assert would be effective, would perform satisfactorily, would not damage crops when used in accordance with instructions and/or reasonable use, and would be safe to use on plaintiff's sunflowers. Defendant breached express warranties, resulting in damage to plaintiff's sunflower crops."  See Docket No. 1-1.  Nufarm contends that the only express warranty on the Assert® product label is that "this product conforms to the chemical description on the label and is reasonably fit for the purposes stated on the Directions for Use when used in accordance with the directions under normal conditions of use."  See Docket No. 30-6.  Nufarm contends that the Assert® label unambiguously disclaims all other express warranties.

The warranties which DJ Coleman alleges have been violated are contained in the Uniform Commercial Code, as adopted by the North Dakota Legislative Assembly in N.D.C.C. ch. 41-02. In North Dakota, the Uniform Commercial Code governs transactions for the sale of goods.  "'A party alleging a breach of warranty has the burden of establishing the existence of a warranty, a

14

breach of warranty, and that the breach of warranty proximately caused the damages alleged.'" <u>Eggl</u>
<u>v. Letvin Equip. Co.</u>, 632 N.W.2d 435, 438 (N.D. 2001) (quoting <u>Hagert v. Hatton Commodities,</u>
<u>Inc.</u>, 384 N.W.2d 654, 657 (N.D. 1986) ("Hagert II"). The determination of whether damages were
proximately caused by a breach of warranty is generally a question of fact. <u>Hagert II</u>, 384 N.W.2d
at 657. Under the North Dakota Uniform Commercial Code, all warranties can be excluded or
modified. N.D.C.C. § 41-02-33. Section 41-02-33 provides, in relevant part:

> 1. Words or conduct relevant to the creation of an express warranty and words
> or conduct tending to negate or limit warranty shall be construed whenever
> reasonable as consistent with each other; but subject to the provisions of this
> chapter on parol or extrinsic evidence (section 41-02-09), negation or
> limitation is inoperative to the extent that such construction is unreasonable.
>
> 2. Subject to subsection 3, to exclude or modify the implied warranty of
> merchantability or any part of it the language must mention merchantability
> and in case of a writing must be conspicuous, and to exclude or modify any
> implied warranty of fitness the exclusion must be by a writing and
> conspicuous . . . .

"Conspicuous" means "so written, displayed, or presented that a reasonable person against
which it is to operate ought to have noticed it. Whether a term is 'conspicuous' or not is a decision
for the court." N.D.C.C. § 41-01-09(2)(j). The statute provides the following examples of
conspicuous terms:

> (1) A heading in capitals equal to or greater in size than the surrounding text, or
> in contrasting type, font, or color to the surrounding text of the same or lesser
> size; and
>
> (2) Language in the body of a record or display in larger type than the
> surrounding text, or in contrasting type, font, or color to the surrounding text
> of the same size, or set off from surrounding text of the same size by symbols
> or other marks that call attention to the language.

<u>Id.</u> "'A contract's warranty disclaimer satisfies the conspicuous requirement when it is printed in
all capital letters, when it appears in a larger type than the terms around it, or when it is in a larger

and boldface type . . . .'"  <u>Red River State Bank v. Reierson</u>, 533 N.W.2d 683, 687 (N.D. 1995)

(quoting <u>Stevenson v. TRW Inc.</u>, 987 F.2d 288, 296 (5th Cir. 1993)).

The Court finds that the warranty disclaimer used by Nufarm on the Assert® label is

conspicuous.  The language disclaiming the express and implied warranties is in capital letters and

bold typesetting.  The Court finds that these actions are sufficient to put a reasonable party on notice

of the disclaimer.

a)  <u><b>EXPRESS WARRANTIES</b></u>

The principal thrust of DJ Coleman's case is that Assert® causes damage to sunflowers even

when used in accordance with the label.  On the Assert® label, Nufarm expressly "warrants that this

product conforms to the chemical description on the label and is reasonably fit for the purposes

stated on the Directions for Use when used in accordance with the directions under normal

conditions of use."  <u>See</u> Docket No. 30-6.  This provision in effect gives an express warranty of

fitness for a particular purpose.  Under the "Directions of Use," the product is labeled for use on

sunflowers in Minnesota, North Dakota, and South Dakota.  <u>See</u> Docket No. 30-6.  The next

sentence in the disclaimer reads as follows:  "NUFARM MAKES NO WARRANTIES OF

MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE, NOR ANY OTHER

EXPRESS OR IMPLIED WARRANTIES WITH RESPECT TO THE SELECTION, PURCHASE

OR USE OF THIS PRODUCT."  <u>See</u> Docket No. 30-6.

Under Section 41-02-33 of the North Dakota Century Code, "Words or conduct relevant to

the creation of an express warranty and words or conduct tending to negate or limit warranty shall

be construed whenever reasonable as consistent with each other; but subject to the provisions of this

16

chapter on parol or extrinsic evidence (section 41-02-09), negation or limitation is inoperative to the extent that such construction is unreasonable."

In studying the language of the two warranty provisions, Nufarm has attempted to both provide an express warranty of fitness for a particular purpose and disclaim any warranties.  The Court finds that Nufarm's words of warranty and disclaimer cannot be reasonably reconciled with one another, as required under N.D.C.C. § 41-02-33 and, therefore, the language of the express warranty must prevail.  See Wenner v. Gulf Oil Corp., 264 N.W.2d 374, 384 (Minn. 1978) (finding that where the warranty and disclaimer on a herbicide label could not be reconciled with each other the language of the express warranty prevailed).

Even if the express warranty prevails, Nufarm contends that DJ Coleman disclaimed any express warranties because Clark Coleman applied Assert® to the 2007 sunflower crop in contravention of the directions on the product label by adding a non-approved adjuvant, Scoil®, and an insecticide, Asana®, to the tank mix.  Nufarm expressly warranted that Assert® is "reasonably fit for the purposes stated on the Directions for Use when used in accordance with the directions under normal conditions of use."  See Docket No. 30-6.  The label also provides, "Any warranties, express or implied, having been made are inapplicable if this product has been used contrary to label instructions, or under abnormal conditions, or under conditions not reasonably foreseeable to (or beyond the control of) seller or Nufarm, and Buyer assumes the risk of any such use."  See Docket No. 30-6.

Under the Directions for Use, the Assert® label provides the following instructions for sunflower application:

**MIXING INSTRUCTIONS**

17

**MIX ONLY WITH SURFACTANTS, ADJUVANTS, AND CROP OILS THAT ARE CLEARED FOR APPLICATION TO GROWING CROPS.**

**A NON-IONIC SURFACTANT CONTAINING AT LEAST 80% ACTIVE INGREDIENT MUST BE USED WITH THIS PRODUCT.**

**. . .**

### SUNFLOWER

**(For Distribution and Use in Minnesota, North Dakota, and South Dakota)**

### GENERAL INFORMATION

This product is a selective herbicide for the post-emergence control of wild mustard in sunflowers.     APPLY THIS PRODUCT POST-EMERGENCE TO SUNFLOWERS NOT UNDER DROUGHT/HEAT STRESS, FROM THE 2-TO-8-LEAF STAGE OF GROWTH (SUNFLOWERS MUST BE LESS THAN 15 INCHES HIGH).   Maximum weed control with this product is obtained when temperature, moisture, fertility and cultural practices provide favorable conditions for active plant growth.  UNIFORM SPRAY COVERAGE IS REQUIRED FOR MAXIMUM WEED CONTROL AND REDUCED INJURY POTENTIAL.

. . .

Nufarm does not recommend tank mixing this product with herbicides or insecticides when used on sunflowers.

See Docket No. 30-6; http://www.nufarm.com/USAg/SearchResults (emphasis in original).  Clark

Coleman testified that in 2007 he tank mixed Assert®, Scoil®, and Asana®.  See Docket No. 30-1,

p. 35.  He relied on the recommendations of his chemical provider, Allen Olson, before tank mixing

Assert® and Scoil®.  See Docket No. 30-1, p. 38.  Clark Coleman admitted that he did not contact

Nufarm to determine whether Assert® could be tank mixed with Scoil®.  See Docket No. 30-1, p.

38.

Henry Buckwalter, a principal consultant with Compliances Services International (CSI),

who specializes in registering agricultural product labels, believes the Assert® label is "burdensome

18

and complex." <u>See</u> Docket No. 42-2, pp. 75-76.  The Court has determined that Buckwalter's

testimony as to the ambiguity of the Assert® label is admissible pursuant to Rule 702 of the Federal

Rules of Evidence.  <u>See</u> Docket No. 90.  Buckwalter testified that, in his expert opinion, the

following language on the Assert® label is ambiguous, conflicting, and misleading:

**MIXING INSTRUCTIONS**

**MIX ONLY WITH SURFACTANTS, ADJUVANTS, AND CROP OILS THAT
ARE CLEARED FOR APPLICATION TO GROWING CROPS.**

**A NON-IONIC SURFACTANT CONTAINING AT LEAST 80% ACTIVE
INGREDIENT MUST BE USED WITH THIS PRODUCT.**

<u>See</u> Docket No. 42-2, pp. 260-65.  In Buckwalter's opinion, the sentences conflict with each other.

Buckwalter interprets the two sentences to mean that "[i]f you do use a surfactant, you must use an

80 percent," but the mixing instructions "also give you the ability to use the other materials"

(adjuvants and crop oils).  <u>See</u> Docket No. 42-2, p. 264.  Buckwalter agreed that Allen Olson, Clark

Coleman's chemical representative, had a responsibility to inform Coleman what agricultural

chemicals could and could not be mixed with Assert®, and that Olson would have learned this

information from Nufarm.  <u>See</u> Docket No. 42-2, p. 328.  Clark Coleman testified that he relied on

the recommendations of Allen Olson to tank mix Assert® with Scoil®.  <u>See</u> Docket No. 30-1, p. 38.

Buckwalter also testified that Nufarm's recommendation to not tank mix Assert® with herbicides

or insecticides when used on sunflowers means the purchaser "can tank mix with it, but Nufarm

doesn't recommend it" and the purchaser's tank mixing would not be in violation of the Federal

Insecticide, Fungicide and Rodenticide Act or state rules.  <u>See</u> Docket No. 42-2, pp. 240-41.  The

Court finds that the testimony of Clark Coleman and Henry Buckwalter create a genuine issue of

material fact as to whether Clark Coleman complied with the requirements on the Assert® label.

19

Nufarm also contends that DJ Coleman cannot establish a breach of express warranty because the record is devoid of any evidence that the chemical specifications or instructions on the Assert® product label are defective.  The Court has determined that there is a genuine issue of fact as to whether Clark Coleman complied with the Assert® label in 2007.  There is conflicting evidence as to whether Assert® caused damage to DJ Coleman's 2007 sunflower crop.  Kent McKay, a North Dakota crop advisor and researcher, testified that in his opinion Assert® caused DJ Coleman's sunflowers to stunt and exhibit deformed heads.  See Docket No. 42-1, p. 66.  Dr. Brian Jenks, a weed scientist for North Dakota State University, testified that he conducted studies on the effect of Assert® tank mixes on sunflowers in 2006, 2007, and 2008.  Dr. Jenks recorded his results and found that in 2006 and 2007, 60 percent of the sunflowers had deformed heads.  See Docket No. 30-8, p. 8.  However, Jenks conducted his own study on the effect of Assert® on sunflowers in 2008 and observed "almost no injury."  See Docket No. 30-8, pp. 13-14.  Adding more confusion to the matter is that Clark Coleman testified that he used the herbicide Assert® for ten years prior to 2007 on his sunflower crops, and that using Assert® was his normal practice to control wild mustard.  See Docket No. 30-1, pp. 21, 32.  When asked whether Assert® has always worked in the past on DJ Coleman's crops, Clark Coleman responded, "It has."  See Docket No. 30-1, p. 35.  The Court finds that there is a genuine issue of material fact as to whether Assert®, in the manner and method used by Clark Coleman in 2007, caused the crop damage.  Accordingly, summary judgment is denied on DJ Coleman's breach of express warranty for a particular purpose claim.

**b)**      **IMPLIED WARRANTIES**

Under North Dakota law, implied warranties can be in the form of implied warranty of merchantability (N.D.C.C. § 41-02-31) or implied warranty of fitness (N.D.C.C. § 41-02-32).  The Assert® label provides the following disclaimer as to implied warranties:  "NUFARM MAKES NO WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE, NOR ANY OTHER EXPRESS OR IMPLIED WARRANTIES WITH RESPECT TO THE SELECTION, PURCHASE OR USE OF THIS PRODUCT."  See Docket No. 30-6.  DJ Coleman contends that it has a valid claim for breach of implied warranties pursuant to N.D.C.C. § 41-02-98(2), which provides:  "If circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title."  There can be no breach of implied warranties where the warranties had been disclaimed pursuant to N.D.C.C. § 41-02-33.

Section 41-02-33(2) of the North Dakota Century Code governs the exclusions or modifications of implied warranties.  Section 41-02-33(2) provides:

> [T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous.  Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

The Court finds that the Assert® label effectively disclaimed all implied warranties.  The disclaimer was in writing, it was conspicuous, and it mentioned merchantability.  Transport Corp. of Am., Inc. v. IBM, 30 F.3d 953, 959 (8th Cir. 1994) (holding that a contract validly disclaimed all implied warranties because it was in writing, was conspicuous, and mentioned merchantability); see also N.D.C.C. § 41-02-33(2).  Accordingly, summary judgment is granted on DJ Coleman's breach of implied warranties claim.

### 2)   APPLICATION OF WARRANTY LANGUAGE LIMITING DAMAGES

Nufarm contends that the Assert® label effectively limits any damages for breach of warranties to either the purchase price or the replacement of the product.  Section 41-02-94 of the North Dakota Century Code permits the recovery of consequential damages for injury to property proximately resulting from any breach of warranty.  However, Section 41-02-98 of the North Dakota Century Code, which is modeled after Section 2-719 of the Uniform Commercial Code, allows the parties to an agreement to limit the remedies available upon breach and to exclude consequential damages:

> 41-02-98.  (2-719) Contractual modification or limitation of remedy.
>
> 1.   Subject to the provisions of subsections 2 and 3 of this section and of section 41-02-97 on liquidation and limitation of damages:
>
> > a.   The agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and
> >
> > b.   Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
>
> 2.   If circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.
>
> 3.   Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable.  Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

Nufarm contends that the Assert® label limits the remedies available to the purchase price of the product.   The Assert® label reads as follows:

> To the extent allowed by law, Nufarm or Seller shall not be liable for any incidental, consequential or special damages resulting from the use or handling of this product. To the extent allowed by law, THE EXCLUSIVE REMEDY OF THE USER OR BUYER, AND THE EXCLUSIVE LIABILITY OF NUFARM AND SELLER FOR ANY AND ALL CLAIMS, LOSSES, INJURIES OR DAMAGES (INCLUDING CLAIMS BASED ON BREACH OF WARRANTY, CONTRACT, NEGLIGENCE, TORTS, STRICT LIABILITY OR OTHERWISE) RESULTING FROM THE USE OR HANDLING OF THIS PRODUCT, SHALL BE THE RETURN OF THE PURCHASE PRICE OF THE PRODUCT OR AT THE ELECTION OF NUFARM OR SELLER, THE REPLACEMENT OF PRODUCT.

See Docket No. 30-6.  DJ Coleman argues that the label's limitation of remedies provision is unconscionable under North Dakota law and, therefore, unenforceable.

The doctrine of unconscionability permits a court to "'deny enforcement of a contract because of procedural abuses arising out of the contract's formation and substantive abuses relating to the terms of the contract.'" Rutherford v. BNSF Ry. Co., 765 N.W.2d 705, 713 (N.D. 2009) (quoting Strand v. U.S. Bank Nat'l Ass'n ND, 693 N.W.2d 918, 921 (N.D. 2005)).   The determination of whether a contractual provision is unconscionable is a question of law.  Constr. Assocs., Inc. v. Fargo Water Equip. Co., 446 N.W.2d 237, 241 (N.D. 1989).  "The court is to look at the contract from the perspective of the time it was entered into, without the benefit of hindsight. The determination to be made is whether, under the circumstances presented in the particular commercial setting, the terms of the agreement are so one-sided as to be unconscionable." Id.

North Dakota law provides the Court with several options when a contract, or clause of a contract, is found to be unconscionable:

1.      If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without

23

> the unconscionable clause, or it may so limit the application of any
> unconscionable clause as to avoid any unconscionable result.

2.    When it is claimed or appears to the court that the contract or any clause
      thereof may be unconscionable the parties shall be afforded a reasonable
      opportunity to present evidence as to its commercial setting, purpose, and
      effect to aid the court in making the determination.

N.D.C.C. § 41-02-19.

There is no North Dakota case that addresses whether a limitation of remedies provision is
unconscionable for injury resulting from the application of agricultural chemicals. The most
relevant North Dakota case held that a provision limiting consequential damages was
unconscionable. See Constr. Assocs., Inc. v. Fargo Water Equip. Co., 446 N.W.2d 237 (N.D. 1989).

In Constr. Assocs., the plaintiff was the successful bidder to construct a water supply line
in Breckenridge, Minnesota. The plaintiff purchased polyvinyl chloride pipe from a retail store in
Fargo, North Dakota to construct the water supply line. The defendant manufacturer of the pipe
shipped the pipe directly to the job site in Minnesota. Included in the shipment of the pipe was an
installation guide, which contained a limitation of remedies provision. The provision provided:

> It is expressly understood and agreed that the limit of J-M's liability shall be the
> resupply of a like quantity of nondefective Product and that J-M shall have no such
> liability except where the damage or claim results solely from breach of J-M's
> warranty. IT IS ALSO AGREED THAT J-M SHALL NOT BE LIABLE FOR ANY
> INCIDENTAL, CONSEQUENTIAL, OR OTHER DAMAGES FOR ANY
> ALLEGED NEGLIGENCE, BREACH OF WARRANTY, STRICT LIABILITY, OR
> ANY OTHER THEORY, OTHER THAN THE LIMITED LIABILITY SET FORTH
> ABOVE.

Id. at 240.

The North Dakota Supreme Court determined that the provision was unconscionable, both
procedurally and substantively. With respect to procedural unconscionability, the court stated,

> The circumstances presented in this case demonstrate a substantial inequality in bargaining power between J-M and Construction Associates. Construction Associates is a relatively small local construction firm, while J-M is part of an enormous, highly diversified, international conglomerate. The limitation of remedies and exclusion of damages were part of a pre-printed installation guide included with all shipments of J-M Pipe. J-M has continually stressed on appeal that those limitations and exclusions are included in all of its brochures and guides. It is obvious that there is no room for bargaining or negotiation as to the warranty provisions.
>
> . . .
>
> Clearly an element of procedural unconscionability is present where J-M took advantage of its superior bargaining power to dictate terms through a pre-printed guide which was not provided to Construction Associates (and then only to field workers) until long after the sales contract had been finalized.

Id. at 242, 243. The court also found that the limitation of remedies provision was substantively unconscionable because replacement pipe left Construction Associates with no effective remedy.[5] The court noted that limitation of remedies provisions are generally held unconscionable when the defect in the product is latent because the buyer is unable to discover the defect until additional damages are incurred. Id. at 244.

Courts from other jurisdictions vary on whether a limitation of remedies provision is unconscionable in the chemical agriculture business. See Lutz Farms v. Asgrow Seed Co., 948 F.2d 638 (10th Cir. 1991) (affirming a district court's finding that a limitation of remedies provision on a seed label was unconscionable); Walker v. Am. Cyanamid Co., 948 P.2d 1123 (Idaho 1997) (finding that a limitation of remedies provision on a herbicide label was unconscionable because the provision was ambiguous and constituted unfair surprise); Mullis v. Speight Seed Farms, Inc., 505 S.E.2d 818 (Ga. Ct. App. 1998) (finding that a limitation of remedies provision on a tobacco seed

---

[5]  The North Dakota Supreme Court noted that the accepted method of repair to a water supply line was to cut out the leaking joints and to repair it with a stainless steel sleeve.

label was unconscionable); <u>Adams v. Am. Cyanamid Co.</u>, 498 N.W.2d 577 (Neb. Ct. App. 1992) (finding that a limitation of remedies provision on a herbicide label was unconscionable); <u>Latimer v. William Mueller & Son, Inc.</u>, 386 N.W.2d 618 (Mich. Ct. App. 1986) (finding that a limitation of remedies provision on a bean seed label was unconscionable); <u>but see</u> <u>Bailey Farms, Inc. v. NOR-AM Chem. Co.</u>, 27 F.3d 188 (6th Cir. 1994) (finding that a limitation of remedies provision on a pesticide label was conscionable because the plaintiff was an experienced farmer who had prior experience with pesticides); <u>Lindemann v. Eli Lilly and Co.</u>, 816 F.2d 199 (5th Cir. 1987) (finding that a limitation of remedies provision on a herbicide label was conscionable because the plaintiff was an experienced farmer who established a course of dealing with the manufacturer in purchasing the herbicide for over twenty years); <u>Gooch v. E.I. Du Pont de Nemours & Co.</u>, 40 F. Supp. 2d 863 (W.D. Ky. 1999) (finding that a limitation of remedies provision on a herbicide label was conscionable because the plaintiff was a sophisticated farmer with experience in purchasing and applying herbicides, the plaintiff read the label in previous years before purchasing the product, and it is appropriate to shift the risk to the farmer given the many uncertainties and variables that exist in the farming industry); <u>Bruce v. ICI Americas, Inc.</u>, 933 F. Supp. 781 (S.D. Iowa 1996) (finding that a limitation of remedies provision on a pesticide label was conscionable because the plaintiffs were sophisticated farmers who have purchased numerous agricultural chemicals with similar provisions and, therefore, should have known of such provisions on the labels of agricultural products); <u>Eugene Jetvig, Inc. v. Monsanto Co.</u>, 1992 WL 400723 (D. Minn. July 30, 1992) (finding that a limitation of remedies provision on a herbicide label was conscionable); <u>Harris Moran Seed Co., Inc. v. Phillips</u>, 949 So.2d 916 (Ala. Civ. App. 2006) (finding that  a limitation of remedies provision on a seed label was conscionable).

In order to find that a provision is unconscionable, there must be a showing of both procedural and substantive unconscionability. "'The concept of unconscionability must necessarily be applied in a flexible manner, taking into consideration all of the facts and circumstances of a particular case.'" Strand, 693 N.W.2d at 924 (quoting Constr. Assocs., 446 N.W.2d at 244).

### a)       PROCEDURAL UNCONSCIONABILITY

"Procedural unconscionability focuses upon formation of the contract and fairness of the bargaining process, including factors such as inequality of bargaining power, oppression, and unfair surprise." Strand, 693 N.W.2d at 924.  Courts are more likely to find unconscionability in consumer transactions than in commercial transactions involving experienced parties.  Id.  "Courts' general skepticism of unconscionability claims in purely commercial transactions stems from the presumption that businessmen possess a greater degree of commercial understanding and substantially stronger economic bargaining power than the ordinary consumer."  Constr. Assocs., 446 N.W.2d at 242.  Nevertheless, the North Dakota Supreme Court has stated:

> "[G]eneralizations are always subject to exceptions and categorization is rarely an adequate substitution for analysis.  With increasing frequency, courts have begun to recognize that experienced but legally unsophisticated businessmen may be unfairly surprised by unconscionable contract terms . . . and that even large business entities may have *relatively* little bargaining power, depending on the identity of the other contracting party and the commercial circumstances surrounding the agreement."

Id. (quoting A&M Produce Co. v. FMC Corp., 186 Cal. Rptr. 114, 124 (Cal. Ct. App. 1982) (emphasis in original)).

This case is somewhat analogous to Constr. Assocs.  It is undisputed that DJ Coleman had no bargaining power to alter the language of the limitation of remedies provision.  The limitation of remedies provision contained on the Assert® label was pre-printed and was not negotiated.

There is a substantial inequality in bargaining power between DJ Coleman and Nufarm.  DJ Coleman is a commercial farming operation located in North Dakota, and Nufarm is part of an enormous, highly diversified, and international conglomerate.  Unlike in <u>Constr. Assocs.</u>, the facts of this case do not demonstrate an element of unfair surprise.  Clark Coleman testified that he used Assert® for ten years prior to 2007.  <u>See</u> Docket No. 30-1, p. 21.  Nonetheless, the evidence reveals that the parties had unequal bargaining power and there was no room for meaningful negotiation.  The purchasers of herbicides, regardless of their experience, are not in a position to bargain for more favorable terms than those listed on the pre-printed label, nor are they in a position to test the effectiveness of a herbicide before purchasing it.  The fact that Clark Coleman was an experienced farmer that had used Assert® on sunflower crops for ten years should not control whether he is entitled to consequential damages for a breach of warranty.  Accordingly, the Court finds that the limitation of remedies provision was procedurally unconscionable.

### b)  <u>SUBSTANTIVE UNCONSCIONABILITY</u>

Substantive unconscionability focuses on the harshness or one-sidedness of the limitation of remedies provision.  <u>Strand</u>, 693 N.W.2d at 922.  The Official Comment to Section 2-719 of the Uniform Commercial Code provides:

> However, it is of the very essence of a sales contact that at least minimum adequate remedies be available.  If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract.  Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed.

The clause at issue here would limit DJ Coleman's remedy for a breach of an express warranty to the purchase price of Assert® or the replacement of the product.  The Court finds that the limitation of remedies provision is substantively unconscionable.  "[T]he farmer is required to expend large sums of money before any defect [] is noticeable, and once a defect is found an entire year's crop might be worthless.  Once the crop has failed, the farmer's only recourse is monetary compensation to cover his lost profit and expenditures; replacement and repair are not viable options."  Mullis, 505 S.E.2d at 821.  It is clear that the allocation of risk for defective herbicides is better shouldered by the manufacturer of the herbicide, rather than the consumer.  The consumer does not have the ability or resources to test its use, but the manufacturer does.  The Court finds that the limitation of remedies provision on the Assert® label is unconscionable, both procedurally and substantively and, therefore, unenforceable.  Accordingly, damages for a breach of express warranty of fitness for a particular purpose are not limited to the purchase price or replacement of the product.

### C.    STATUTORY VIOLATIONS

DJ Coleman alleges that Nufarm violated N.D.C.C. ch. 51-12 through untrue, deceptive, or misleading advertising regarding the effectiveness, performance, proper use, and safety of Assert®.  DJ Coleman also alleges that Nufarm violated N.D.C.C. ch. 51-15 by using deceptive acts or practices, fraud, false pretenses, false promises, and misrepresentations regarding the effectiveness, performance, proper use, and safety of Assert®.  DJ Coleman is essentially arguing that Nufarm misbranded Assert® as a product that is safe for use on sunflowers, and argues that Assert® should not be labeled for sunflowers at all.

29

Nufarm contends that DJ Coleman's claims for statutory violations must fail for a variety of reasons:  (1) Clark Coleman did not read or rely upon the instructions on the Assert® label prior to spraying the herbicide on the 2007 sunflower crop and, therefore, Clark Coleman could not have been a recipient of any advertising by Assert®; (2) the Assert® label is not ambiguous; and (3) there was no intent by Nufarm to harm Clark Coleman or DJ Coleman.  Nufarm contends that the record is devoid of any evidence that "Nufarm engaged in any advertising or public statement at all, much less that Coleman relied in any way on Nufarm for his pesticide purchasing decisions or use (he relied on his UAP salesman), and Coleman did not read the Nufarm product label . . . ."  See Docket No. 45.

It is well-established that consumer protection statutes are remedial in nature and must be liberally construed in favor of the consumer.  State ex rel. Spaeth v. Eddy Furniture Co., 386 N.W.2d 901, 903 (N.D. 1986).  When an action is brought under either N.D.C.C. chs. 51-12 or 51-15, the fraudulent conduct must be proved by a preponderance of the evidence.  Id.

## 1)   CHAPTER 51-12

Section 51-12-01 of the North Dakota Century Code prohibits false and misleading advertising, and provides, in relevant part:

51-12-01.  False and misleading advertising prohibited.


1.      No person with intent to sell, dispose of, increase the consumption of, or induce the public to enter an obligation relative to or to acquire title or interest in any food, drug, medicine, patent and proprietary product, merchandise, security, service, performance, medical treatment, paint, varnish, oil, clothing, wearing apparel, machinery, or anything offered to the public may make, publish, disseminate, circulate, or place before the public

> . . . in a newspaper, or other publication, . . . an advertisement that contains any assertion, representation, or statement of fact, including the price thereof, which is untrue, deceptive, or misleading . . . .

Under the North Dakota Century Code, false advertising is generally defined as:

> 51-12-08.  False advertising – Generally.  It is unlawful for any person with intent, directly or indirectly, to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, in any newspaper or other publication, . . . or in any other manner or means whatever, any statement, concerning such real or personal property or services, professional or otherwise or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

The Court finds that N.D.C.C. ch. 51-12 does not allow for an implied private right of action for damages.  See Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc., 628 N.W.2d 707 (N.D. 2001) (finding that there is no implied right of action for damages under the Unfair Discrimination Law, N.D.C.C. ch. 51-09, and the Unfair Trade Practices Law, N.D.C.C. ch. 51-10, which similarly provides for injunctive relief, and a violation of either provision is a class A misdemeanor).  Violation of N.D.C.C. ch. 51-12 is a class B misdemeanor.  N.D.C.C. §§ 51-12-02 and 51-12-13.  Section 51-12-14 describes the remedies available under the chapter:

> Any person who violates or proposes to violate any of the provisions of sections 51-12-08 through 51-12-12 may be enjoined by any court of competent jurisdiction.

> Actions for injunction under this section may be prosecuted by the attorney general or any state's attorney in this state in the name of the people of the state of North Dakota upon their own complaint or upon the complaint of any board, officer, person, corporation, limited liability company, or association or by any person acting for the interests of itself, its members, or the general public.

By creating a private right of action for injunctive relief, but not for damages, the North Dakota Legislative Assembly has clearly expressed its intent to not create a private remedy for damages. Accordingly, the only relief available under N.D.C.C. ch. 51-12 is injunctive relief.

The record establishes that Nufarm markets on its website that Assert® is a herbicide which controls wild mustard in sunflowers.   <u>See</u> Docket Nos. 30-6 and 36-5; <u>see</u> <u>also</u> http://www.nufarm.com/USAg/SearchResults.  DJ Coleman alleges that Assert® caused damage to its 2007 sunflower crop even though Assert® was applied in accordance with the label.  The Court finds that DJ Coleman has standing to maintain an action for injunctive relief under N.D.C.C. § 51-12-14.  However, the complaint makes no request for injunctive relief.  DJ Coleman seeks only economic and non-economic damages, costs, disbursements, attorney's fees, and "such other and further relief [] the Court deems just and appropriate."  <u>See</u> Docket No. 1-1.  The Court finds that the language "such other and further relief" does not amount to a request for injunctive relief in this case.  Accordingly, the Court grants summary judgment as to DJ Coleman's claim of a statutory violation under N.D.C.C. ch. 51-12.

### 2)   <u>CHAPTER 51-15</u>

Section 51-15-02 of the North Dakota Century Code is North Dakota's version of a consumer sales fraud prevention act.  Section 51-15-02 defines an unlawful practice as the act, use, or employment of a deceptive act or practice, fraud, false pretense, false promise, or misrepresentation in connection with the sale or advertisement of any merchandise.  Section 51-15-09 of the North Dakota Century Code provides:

> [T]his chapter does not bar any claim for relief by any person against any person who has acquired any moneys or property by means of any practice declared to be

32

unlawful in this chapter.  If the court finds the defendant knowingly committed the conduct, the court may order that that person commencing the action recover up to three times the actual damages proven and the court must order that the person commencing the action recover costs, disbursements, and actual reasonable attorney's fees incurred in the action.

"Merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate, charitable contributions, or services."  N.D.C.C. § 51-15-01(3).  "Person" is defined as "any natural person or the person's legal representative, partnership, corporation, limited liability company, company, trust, business entity, or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee, or cestui que trust thereof."  N.D.C.C. § 51-15-01(4).

In Jorgenson v. Agway, Inc., 627 N.W.2d 391 (N.D. 2001), the North Dakota Supreme Court considered whether N.D.C.C. ch. 51-15 applied only to consumer transactions.  The plaintiffs were farmers who purchased sunflower seeds for use in cultivating crops for subsequent sale.  The defendant sunflower seed manufacturer argued that N.D.C.C. ch 51-15 applies only to consumer transactions, and that the plaintiffs' purchase of the seeds was "mercantile" and production-oriented in nature, and not consumer-oriented.  The Court stated:

Although N.D.C.C. ch. 51-15 is entitled "consumer fraud and unlawful credit practices," the word "consumer" does not otherwise appear in the text of N.D.C.C. ch. 51-15.  Headnotes describing the title of a chapter of the code do not constitute any part of the statute and may not be used to determine legislative intent.  N.D.C.C. § 1-02-12.  See Mees v. Ereth, 492 N.W.2d 72, 75 (N.D. 1992).  Instead, we look to the statutory language used in N.D.C.C. ch. 51-15.  The plain and unambiguous language of N.D.C.C. § 51-15-02, prohibits an "unlawful practice" in connection with the sale or advertisement of any "merchandise," which is broadly defined in N.D.C.C. § 51-15-01(3) as "any objects, wares, goods, commodities, intangibles, real estate, or services."  The definition of merchandise is broad enough to include confection sunflower seeds.  Moreover, the clear and unambiguous language of N.D.C.C. § 51-15-09, does not preclude an action by "any person against any person who has acquired any moneys or property by means of any practice declared to be unlawful" under N.D.C.C. § 51-15-02.  The broad definition of "person" includes

33

"any natural person" or other business entity, see N.D.C.C. § 51-15-01(4) and "person" is not necessarily limited to "consumer" or "consumer transactions" as defined by [the defendant]. The plain and unambiguous definition of person belies a legislative intent to limit the provisions that do not preclude an action by any person in N.D.C.C. § 51-15-09 to consumer transactions as defined by [the defendant]. The plain and unambiguous definition of "person" manifests a legislative intent that N.D.C.C. ch. 51-15 applies to a farmer who purchases confection sunflower seeds for use in cultivating a sunflower crop for subsequent sale, and who alleges the seed was marketed and sold in violation of N.D.C.C. ch. 51-15.

Jorgenson, 627 N.W.2d at 394.

In accordance with the ruling in Jorgenson, the Court finds that North Dakota's Consumer Fraud Act, N.D.C.C. ch. 51-15, applies to Clark Coleman's purchase of the herbicide Assert® for use on DJ Coleman's commercial farming operations. The definition of "merchandise" is broad enough to encompass the herbicide Assert® and Clark Coleman is a "person" under N.D.C.C. ch. 51-15. Under N.D.C.C. § 51-15-09, "[i]f the court finds the defendant knowingly committed the conduct, the court may order that the person commencing the action recover up to three times the actual damages proven and the court must order that the person commencing the action recover costs, disbursements, and actual reasonable attorney's fees incurred in the action." It is clear that North Dakota law allows for the recovery of punitive damages under N.D.C.C. ch. 51-15.

Nufarm contends that "[s]ince there is and can be no evidence that Nufarm engaged in any advertising or public statement at all, much less that Coleman relied in any way on Nufarm for his pesticide purchasing decisions or use (he relied on his UAP salesman), and Coleman did not read the Nufarm product label, Plaintiff's claims for false and deceptive advertising should be dismissed." See Docket No. 45. The Court finds Nufarm's arguments unpersuasive. The evidence clearly establishes that Nufarm advertised on its website that Assert® is safe for use on sunflowers in North Dakota. Clark Coleman testified that he relied on the advice of his UAP salesman and crop

34

consultant in using agricultural chemicals, including Assert®.  <u>See</u> Docket No. 30-1, pp. 32-34.  It is undisputed that Nufarm has marketed Assert® as a safe and effective product to control wild mustard in sunflowers.  Clark Coleman relied on these representations by Nufarm, whether or not he read the Assert® label in 2007.  Clark Coleman had purchased Assert® for ten years prior to 2007 for use on sunflowers and was "sure" that he had read the Assert® label sometime before then. <u>See</u> Docket No. 30-1, p. 36.

DJ Coleman's claims under the Consumer Fraud Act, N.D.C.C. ch. 51-15, are directly related to the breach of express warranty claim and, therefore, the Court finds that there is a genuine issue of material fact as to whether Nufarm engaged in deceptive advertising.


**D.      SOPHISTICATED USER DOCTRINE**

Nufarm argues that Clark Coleman is a sophisticated user of pesticides and other agricultural chemicals and, therefore, cannot sustain claims against Nufarm for damage caused by the use of Assert®.  Nufarm's entire argument is based on the assumption that Clark Coleman knew or should have known that Assert® would cause damage to sunflowers.  The sophisticated user doctrine acts as an exception to manufacturers' general duty to warn customers.  <u>Johnson v. Am. Standard, Inc.</u>, 179 P.3d 905, 907-08 (Cal. 2008).  "The 'fundamental tenet' of the sophisticated user doctrine is that 'a manufacturer should be allowed to rely upon certain knowledgeable individuals to whom it sells a product to convey to the ultimate users warnings regarding any dangers associated with the product.'"  <u>Conwed Corp. v. Union Carbide Chems. and Plastics Co., Inc.</u>, 287 F. Supp. 2d 993, 995 (D. Minn. 2001) (quoting <u>In re TMJ Implants Prods. Liab. Litig.</u>, 827 F. Supp. 1019, 1029 (D. Minn.

1995)).  The sophisticated user doctrine evolved out of the Restatement (Second) of Torts § 388,[6]

and applies to strict liability and negligent failure to warn claims.  Johnson, 179 P.3d at 911.  The

Court has determined that the economic loss doctrine bars DJ Coleman's failure to warn claim.

Accordingly, the Court need not consider whether the sophisticated user doctrine also would have

barred this claim.


E.    FIFRA

Nufarm alleges that DJ Coleman's claims are pre-empted by the Federal Insecticide,

Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136-136y.  Pre-emption is based upon the

Supremacy Clause of Article VI of the United States Constitution.  U.S. Const. art. VI, cl. 2 ("This

Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall

be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing

in the Constitution or Laws of any State to the Contrary notwithstanding.").  Under the Supremacy

Clause of the Constitution, federal law may pre-empt state law.  There are three ways that federal

law may pre-empt state law: (1) "state law is preempted where Congress has expressly stated that

---

[6]    Section 388 of the Restatement (Second) of Torts provides:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier:

(a)    knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b)    has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c)    fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

it intends to prohibit state regulation in an area"; (2) "Congress may implicitly preempt state regulation of an area through occupation of a field"; and (3) "state regulations are preempted to the extent they conflict with federal law." N. Natural Gas Co. v. Iowa Utils. Bd., 377 F.3d 817, 821 (8th Cir. 2004).

FIFRA provides a comprehensive scheme for the regulation of pesticide labeling and packaging. Under FIFRA, a pesticide must be registered by the Environmental Protection Agency (EPA). FIFRA's definition of the term "pesticide" includes herbicides such as Assert®. See 7 U.S.C. § 136(u); Dahlman Farms, Inc. v. FMC Corp., 240 F. Supp. 2d 1012, 1016 (D. Minn. 2002). "'The objectives and purposes of FIFRA include the strengthening of federal standards, increasing EPA authority for their enforcement, and providing a comprehensive and uniform regulation of the labeling, sale, and use of pesticides.'" Welchert v. Am. Cyanamid, Inc., 59 F.3d 69, 71 (8th Cir. 1995) (quoting Worm v. Am. Cyanamid Co., 5 F.3d 744, 747 (4th Cir. 1993)).

FIFRA establishes a complex review process for approval of a pesticide label under which a product may be marketed. Welchert, 59 F.3d at 71. Manufacturers are required to submit draft label language addressing a number of topics, including ingredients, directions for use, and adverse effects of the products. See 7 U.S.C. § 136a(c); 40 C.F.R. § 152.50. The final label must be approved by the EPA prior to registration. See 40 C.F.R. § 156.10(a)(6). Under FIFRA, the EPA must register a pesticide if it is determined that the pesticide is efficacious, that it will not cause unreasonable adverse effects on humans and the environment, and that its label is not misbranded. Bates v. Dow Agrosciences LLC, 544 U.S. 431, 438 (2005) (citing  7 U.S.C. § 136(bb); 7 U.S.C.

§ 136a(c)(5); 40 C.F.R. §152.112(f) (2004)).[7]  A pesticide is misbranded if, among other things, its label is false or misleading in any manner or its label does not contain adequate instructions for use. 7 U.S.C. § 136(q)(1)(A), (F).  "Because it is unlawful under the statute to sell a pesticide that is registered but nevertheless misbranded, manufacturers have a continuing obligation to adhere to FIFRA's labeling requirements."  Bates, 544 U.S. at 438 (citing 7 U.S.C. § 136j(a)(1)(E)). Nonetheless, a state "shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." 7 U.S.C. § 136v(b).

In Bates, the United States Supreme Court considered whether 7 U.S.C. § 136v(b) of FIFRA pre-empted Texas peanut farmers' state law claims for damages.  In 2000, the EPA conditionally registered a herbicide manufactured by Dow, Strongarm®, for peanuts.  The label stated, "Use of Strongarm is recommended in all areas where peanuts are grown," and Dow's salesmen made similar representations to its customers.  Bates, 544 U.S. at 435.  The farmers who used the herbicide had fields in which the pH level of the soils was 7.2 or higher, and noticed damage to their peanut crops.  The farmers reported the damage to Dow representatives, and Dow re-registered the herbicide in 2001 with a supplemental label which warned, "Do not apply Strongarm to soils with a pH of 7.2 or greater."  Id.

The farmers filed an action in federal district court, arguing that Dow knew or should have known that the herbicide caused damage to peanuts when used on soils with a pH of 7.0 or higher. The farmers brought claims under the Texas Deceptive Trade Practices-Consumer Protection Act

---

[7]  Due to complaints by the EPA of limited resources, Congress amended FIFRA in 1978 to allow the EPA to waive data requirements pertaining to efficacy, thus permitting the EPA to register a pesticide without confirming its efficacy.  "In a notice published years later in 1996, EPA confirmed that it had 'stopped evaluating pesticide efficacy for routine label approvals almost two decades ago.'"  Bates, 544 U.S. at 440 (quoting Pesticide Registration Notice 96-4, p. 3 (June 3, 1996)).

and tort claims sounding in negligence and strict liability, fraud, and breach of warranty.  The district court dismissed one of the claims on state law grounds and dismissed the remainder of the claims on the grounds that the claims were pre-empted by 7 U.S.C. § 136v(b) of FIFRA.  See Dow AgroSciences, LLC v. Bates, 205 F. Supp. 2d 623 (N.D. Tex. 2002).  The Court of Appeals affirmed.  Dow Agrosciences LLC v. Bates, 332 F.3d 323 (5th Cir. 2003).

The United States Supreme Court clarified that FIFRA does not remove the authority of states to review labels to ensure compliance with both federal and state laws:

> As a part of their supplementary role, States have ample authority to review pesticide labels to ensure that they comply with both federal and state labeling requirements.  Nothing in the text of FIFRA would prevent a State from making the violation of a federal labeling or packaging requirement a state offense, thereby imposing its own sanctions on pesticide manufacturers who violate federal law.  The imposition of state sanctions for violating state rules that merely duplicate federal requirements is equally consistent with the text of § 136v.

Bates, 544 U.S. at 442.  The Supreme Court broke down the language of 7 U.S.C. § 136v(b) to determine whether that section pre-empted the petitioners' state law claims.  The language of Section 136v(b) provides:  "Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter."  The Supreme Court noted that the prohibitions of Section 136v(b) only apply to "requirements."  A requirement is more than an occurrence which motivates an optional decision; the term "requirements" "reaches beyond positive enactments, such as statutes and regulations, to embrace common-law duties."  Id. at 443.  The Supreme Court determined that for a state rule (including statutes and common laws) to be pre-empted:

> it must satisfy two conditions.  First, it must be a requirement "*for labeling or packaging*"; rules governing the design of a product, for example, are not pre-empted.  Second, it must impose a labeling or packaging requirement that is "*in addition to or different from* those required under this subchapter."  A state

39

> regulation requiring the word "poison" to appear in red letters, for instance, would
> not be pre-empted if an EPA regulation imposed the same requirement.

Id. at 444 (emphasis in original).   The Supreme Court found that many common-law claims,

including the claims upon which the petitioners relied, do not constitute requirements for "labeling

or packaging" and, therefore, are not pre-empted:

> It is perfectly clear that many of the common-law rules upon which
> petitioners rely do not satisfy the first condition.  Rules that require manufacturers
> to design reasonably safe products, to use due care in conducting appropriate testing
> of their products, to market products free of manufacturing defects, and to honor
> their express warranties or other contractual commitments plainly do not qualify as
> requirements for "labeling or package."  None of these common-law rules requires
> that manufacturers label or package their products in any particular way.  Thus,
> petitioners' claims for defective design, defective manufacture, negligent testing, and
> breach of express warranty are not pre-empted.

Id.  The Supreme Court also determined that the petitioners' breach of warranty claims were not pre-

empted because "a cause of action on an express warranty asks only that a manufacturer make good

on the contractual commitment that it voluntarily undertook by placing that warranty on its product,"

and does not require that the manufacturer make an express warranty.  Id. at 444-45.  Accordingly,

the breach of warranty claims did not impose a requirement "for labeling or packaging."  Id. at 445.

The Supreme Court determined that the petitioners' fraud and negligent failure-to-warn claims were

premised on common-law rules that qualified as "requirements for labeling or packaging."  Id. at

446.  The Supreme Court determined that to the extent that the petitioners' fraud claims were based

on oral representations made by Dow agents, such representations fell outside of 7 U.S.C. § 136v(b).

The Supreme Court remanded the action to the Fifth Circuit Court of Appeals to determine whether

the petitioners' fraud claims (based on written representations) and negligent failure-to-warn claims

survived pre-emption because of insufficient briefing, but noted that to survive pre-emption state

law labeling requirements must be equivalent to FIFRA's.  Id. at 453.  The language of the state law labeling requirements need not be identical to FIFRA's, only genuinely equivalent.  Id. at 454.

In the present case, DJ Coleman alleges that Nufarm misbranded the Assert® label as being fit for use on sunflowers.  Applying Bates, the Court finds that FIFRA does not pre-empt DJ Coleman's breach of warranty claims because such claims do not impose labeling requirements and, therefore, cannot conflict with FIFRA.

DJ Coleman's fraudulent advertising claims are based on written[8] representations on the Assert® label and on Nufarm's website, that Assert® is safe for use on sunflowers.[9]  "[7 U.S.C. § 136v(b)] prohibits only state-law labeling and packaging requirements that are '*in addition to or different from*' the labeling and packaging requirements under FIFRA.  Thus, a state-law labeling requirement is not pre-empted by § 136v(b) if it is equivalent to, and fully consistent with, FIFRA's misbranding provisions."  Bates, 544 U.S. at 447 (emphasis in original).  However, if the element of falsity or misrepresentation is broader under N.D.C.C. ch. 51-15 than under FIFRA's obligation that labels not contain false or misleading statements, then FIFRA pre-empts state law to the extent of that difference.  The federal statute requires that a pesticide label not contain statements that are

---

[8]  Clark Coleman testified that he never talked to a Nufarm representative about using Assert®.  See Docket No. 30-1, p. 38.

[9]  Under 7 U.S.C. § 136(p)(2) of FIFRA, the term "labeling" means all labels and all other written, printed, or graphic matter –

    (A)       accompanying the pesticide or device at any time; or
    (B)       to which reference is made on the label or in literature accompanying the pesticide or device . . . .

The Court finds that Nufarm's website qualifies as "labeling" under FIFRA.  Even though the materials on the website don't accompany the product at the time of purchase, the website contains a brochure of Assert® and the representations on the website are consistent with the label, that the product is safe for use on sunflowers in Minnesota, North Dakota, and South Dakota.  See Kordel v. United States, 335 U.S. 345 (1948); Mortellite v. Novartis Crop Prot., Inc., 460 F.3d 483 (3d Cir. 2006); Indian Brand Farms, Inc. v. Novartis Crop Prot., Inc., 2007 WL 4571087 (D.N.J. Dec. 20, 2007).

"false or misleading in any particular."  7 U.S.C. § 136(q)(1)(A).  Section 51-15-02 of the North

Dakota Century Code describes the unlawful sales or advertising practices that are governed under

North Dakota's Consumer Fraud Act, and provides:

> 51-15-02.   Unlawful practices – Fraud – Misrepresentation.   The act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice.

The Court finds that N.D.C.C. § 51-15-02 clearly imposes a broader obligation than FIFRA's

requirement that labels not contain "false or misleading" statements, and that N.D.C.C. § 51-15-02

is not genuinely equivalent to FIFRA's obligation under 7 U.S.C. § 136(q)(1)(A).  Accordingly, the

Court finds that FIFRA pre-empts DJ Coleman's claims under the Consumer Fraud Act, N.D.C.C.

ch. 51-15.


IV.     **CONCLUSION**

      For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART**

the Defendant's "Motion for Summary Judgment" (Docket No. 28) and "Renewed Motion for

Summary Judgment and Reply to Plaintiff's Reply to Defendant's Summary Judgment Motion"

(Docket No. 40).  Summary judgment is granted on the Plaintiff's products liability, negligence, failure to warn, breach of implied warranties, and statutory violation (N.D.C.C. chs. 51-12 and 51-15) claims.  Summary judgment is denied on the Plaintiff's breach of express warranties claim.

**IT IS SO ORDERED.**

Dated this 12th day of March, 2010.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court

43